**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1]<br><br>Remaining Debtors. | Chapter 11<br><br>Case No. 17-12560 (BLS)<br><br>(Jointly Administered) |
| WOODBRIDGE LIQUIDATION TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT SHAPIRO, JERI SHAPIRO, 3X A CHARM, LLC, CARBONDALE BASALT OWNERS, LLC, DAVANA SHERMAN OAKS OWNERS, LLC, IN TREND STAGING, LLC, MIDLAND LOOP ENTERPRISES, LLC, SCHWARTZ MEDIA BUYING COMPANY, LLC and STOVER REAL ESTATE PARTNERS, LLC,<br><br>Defendants. | Adversary Proceeding<br>Case No. 19-51076 (BLS) |

**FIRST AMENDED COMPLAINT FOR AVOIDANCE AND RECOVERY OF AVOIDABLE TRANSFERS, FRAUD, AIDING AND ABETTING FRAUD, UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTY, AND THE SALE OF UNREGISTERED SECURITIES**

[1] The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.

The Woodbridge Liquidation Trust (the "Liquidation Trust" or "Plaintiff"), formed pursuant to the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* dated August 22, 2018 (Bankr. Docket No. 2397) (as it may be amended, modified, supplemented, or restated from time to time, the "Plan"[2]), as and for its *Complaint for: (I) Avoidance and Recovery of Avoidable Transfers, (II) Sale of Unregistered Securities, (III) Fraud, (IV) Aiding and Abetting Fraud; and (V) Breach of Fiduciary Duty* (this "Complaint") against Robert Shapiro ("Shapiro"), Jeri Shapiro ("Mrs. Shapiro") and 3X A Charm, LLC ("Charm"), Carbondale Basalt Owners, LLC ("Carbondale"), Davana Sherman Oaks Owners, LLC ("Davana"), In Trend Staging, LLC ("In Trend"), Midland Loop Enterprises, LLC ("Midland"), Schwartz Media Buying Company, LLC ("Schwartz"), and Stover Real Estate Partners, LLC ("Stover") (collectively, the "Corporate Defendants," and together with Shapiro and Mrs. Shapiro, the "Defendants"), alleges as follows:

## **NATURE OF THE ACTION**

1. Beginning no later than July 2012 through December 1, 2017, Woodbridge Group of Companies, LLC and its 305 debtor affiliates (collectively, the "Debtors") were operated by their founder and principal, Shapiro, as a Ponzi scheme. As part of this fraud, Shapiro and his lieutenants utilized the Debtors to raise over one billion dollars from approximately 10,000 investors nationwide as either Noteholders or Unitholders (collectively, "Investors").

2. Those Investors, many of whom were elderly, often placed a substantial percentage of their net worth (including savings and retirement accounts) with the Debtors and now stand to lose a significant portion of their investments and to be delayed in the return of the remaining portion. The quality of the Investors' lives will likely be substantially and adversely

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

affected by the fraud perpetrated by Shapiro and those individuals and entities that helped perpetuate the fraudulent scheme.

3. This lawsuit seeks to (i) avoid and recover at least $20,689,247.36 previously transferred to Defendants on the grounds that such transfers were preferential, actually fraudulent, and/or constructively fraudulent; (ii) hold Shapiro liable for fraud, unjust enrichment, breach of fiduciary duty, and the sale of unregistered securities, and to recover damages caused by such wrongful conduct, (iii) hold Mrs. Shapiro liable for aiding and abetting the fraud perpetrated by Shapiro, unjust enrichment, and breach of fiduciary duty, and to recover damages caused by such wrongful conduct; and (iv) hold the Corporate Defendants liable for unjust enrichment.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action under 28 U.S.C. §§ 157(a) and 1334. Counts I through V of this adversary proceeding are core within the meaning of 28 U.S.C. § 157(b)(2)(B), (C), (F), and (H), and Counts VI through X are non-core. Plaintiff consents to entry of final orders or judgment by this Court on all counts.

5. Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

### *The Liquidation Trust*

6. On December 4, 2017 (the "Initial Petition Date"), certain of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. Other of the Debtors filed with their own voluntary cases (collectively with those of the original Debtors, the

"Bankruptcy Cases") within the following four months (each such date, including the Initial Petition Date, a "Petition Date").

7. On October 26, 2018, this Court entered an order confirming the Plan (Bankr. Docket No. 2903).

8. The Plan provides for, *inter alia*, the establishment of the Liquidation Trust on the Effective Date of the Plan for the benefit of the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and the Liquidation Trust Agreement. *See* Plan §§ 1.75, 5.4.

9. The Effective Date of the Plan occurred on February 15, 2019.

10. On February 25, 2019, the Court entered an order closing the Bankruptcy Cases of all Debtors except Woodbridge Group of Companies, LLC and Woodbridge Mortgage Investment Fund 1, LLC (together, the "Remaining Debtors"). The Remaining Debtors' Bankruptcy Cases are jointly administered under Case No. 17-12560 (BLS).

11. On the Effective Date, the Liquidation Trust was automatically vested with all of the Debtors' and the Estates' respective rights, title, and interest in and to all Liquidation Trust Assets. *See* Plan § 5.4.3. Further, the Liquidation Trust, as successor in interest to the Debtors, has the right and power to file and pursue any and all "Liquidation Trust Actions" without any further order of the Bankruptcy Court. *Id.* § 5.4.15. "Liquidation Trust Actions" include, *inter alia*, "all Avoidance Actions and Causes of Action held by the Debtors or the Estates …." *Id.* § 1.76.

12. In addition to its status as successor in interest to the Debtors and their estates, the Liquidation Trust also holds claims held by Investors who elected to contribute to the Liquidation Trust certain causes of action that those Investors possess against individuals and entities such as the Defendants (the "Contributed Claims"). *Id.* § 1.28 (defining "Contributed

Claims" to include "All Causes of Action that a Noteholder or Unitholder has against any Person that is not a Released Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties, including … all Causes of Action based on, arising out of, or related to the marketing, sale, and issuance of any Notes or Units; … all Causes of Action based on, arising out of, or related to the misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and … all Causes of Action based on, arising out of, or related to any failure to disclose, or actual or attempted cover up or obfuscation of, any of the conduct described in the Disclosure Statement, including in respect of any alleged fraud related thereto").

***Defendants***

13. Plaintiff is informed and believes and thereupon alleges that Shapiro is in the custody of the United States Bureau of Prisons ("BOP") and is currently incarcerated at the Miami, Florida Federal Detention Center.

14. Plaintiff is informed and believes and thereupon alleges that Mrs. Shapiro is an individual residing in Sherman Oaks, California. Mrs. Shapiro was employed by Debtors Woodbridge Structured Funding, LLC and Woodbridge Group of Companies, LLC. Mrs. Shapiro is Shapiro's wife.

15. In April 2019, Shapiro and two others were indicted by a Grand Jury sitting in the Southern District of Florida and charged with a litany of crimes relating to the Ponzi scheme, including conspiracy, wire fraud, mail fraud, money laundering, and tax evasion.

16. In August 2019, Shapiro entered into a Plea Agreement (the "Plea Agreement") with the Government pursuant to which, among other things, (a) he agreed to plead guilty to conspiracy to commit mail fraud and wire fraud as well as tax evasion, (b) he agreed to forfeit

"any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of conviction" (including a bank accounts, specified jewelry and other assets), and (c) the Government agreed to enter into a non-prosecution agreement with Mrs. Shapiro. The Plea Agreement is incorporated herein by reference and a copy is attached hereto as Exhibit A.

17. On the same day, Mrs. Shapiro entered into a Consent to Forfeiture (the "Consent to Forfeiture") with the Government pursuant to which, among other things, she acknowledged that (a) from 2012 through April 2018, Shapiro transferred over $9 million from the Debtors' accounts to accounts in Mrs. Shapiro's name or in the names of entities controlled by her; (b) such funds were used to, among other things, make purchases at Christie's Auction and other art galleries, including works of art and jewelry; and (c) assets in approximately forty-six (46) separate accounts in which Mrs. Shapiro had an ownership interest or that she otherwise operated on behalf of her husband, for his use and benefit, were subject to forfeiture along with an extensive collection of luxury jewelry, wine and other assets. The Consent to Forfeiture is incorporated herein by reference and a copy is attached hereto as Exhibit B.

18. Plaintiff is informed and believes and thereupon alleges that each of the Corporate Defendants is a Delaware limited liability company. Plaintiff is further informed and believes that Mrs. Shapiro is the member of each of the Corporate Defendants or the entity that is the member of each of the Corporate Defendants and that each was owned, managed, dominated, and controlled by Shapiro or Mrs. Shapiro or members of their family.

19. As acknowledged by Mrs. Shapiro in her *Consent to Forfeiture*, the Debtors often made transfers to the Corporate Defendants for the benefit of Shapiro and Mrs. Shapiro and their family (as reflected on the exhibits attached hereto).

## FACTUAL BACKGROUND

***The Fraud***

20. Since at least July 2012 until shortly before they sought bankruptcy protection, the Debtors were operated as a Ponzi scheme. As this Court explained in its order confirming the Plan:

> The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered no later than December 2017.

21. The securities sold by Shapiro and those working in concert with him, including his lieutenants and network of unlicensed brokers and sellers of securities (*i.e.*, the Debtors' Notes and Units), were not registered with the Securities and Exchange Commission (the "SEC") or applicable state securities agencies and there was no applicable exemption from registration. Nor were Shapiro, his lieutenants and network of unlicensed brokers and sellers of securities registered as broker-dealers with the SEC or applicable state agencies.

22. Shapiro, his lieutenants, and his network of unlicensed brokers and sellers of securities often told Investors that they were investing money to be loaned to a third-party borrower with respect to particular properties owned by such third parties. Investors were often further told that those properties were worth substantially more than the loans against the properties and that the Investors would (i) receive periodic interest payments from these third parties (ii) be protected by the grant of security interests and/or mortgages against such properties. Shapiro, his lieutenants, and his network of unlicensed brokers and sellers of securities, represented to Investors that the Debtors' profits would be generated by the difference

between the interest rate the Debtors charged its third-party borrowers and the interest rate it paid Investors.

23. In reality, these were lies on a massive scale. Investors' money was nearly entirely *not* used to make high-interest loans to unrelated, third-party borrowers, and Investors' money was *not* used for the specific property that may have been identified in any particular Investor's documentation from the Debtors. Instead, Shapiro created disguised affiliates to which money was "loaned," which entities had no ability to service debt. Shapiro further took nearly all of the investors' money and commingled it into one central bank account. The funds used for property purchases from this central, pooled account generally cannot be traced to any particular Woodbridge "fund" entity or its investors. Moreover, payments from that central, pooled account were not used only for property purchases. Shapiro also used investor money to pay approximately $64.5 million in commissions to sales agents who sold these fraudulent "investments" and used investor money to pay at least $21.2 million for Shapiro's and Mrs. Shapiro's personal benefit (including, for example, purchasing luxury items, travel, wine, and the like). Additionally and critically, in the absence of any meaningful cash inflows into the Debtors from sources other than Investors, Shapiro and the Debtors, which he controlled, used hundreds of millions of dollars of new Investor funds to pay "interest" and "principal" to existing investors—a defining feature of Ponzi schemes.

24. Because the Debtors operated as a Ponzi scheme, obtaining new money from Investors into the Ponzi scheme conferred no net benefit on the Debtors; on the contrary, each new investment was a net negative. Money was siphoned off to pay the expenses described above, so that the Debtors actually received only a fraction of the investment dollars. New money also perpetuated the Ponzi scheme, as such money enabled the Debtors to return fictitious

"profits" to early Investors – an essential component of the scheme, because "repaying" early Investors led to new investments, without which the house of cards would fall, as it eventually did. At the same time, each investment created an obligation to return to the defrauded Investor 100% of the investment, such that each new investment increased the Debtors' liabilities and ultimately left them unable to satisfy their aggregate liabilities.

25. Mrs. Shapiro, individually and through the Corporate Defendants, helped create the false appearance that the Debtors were a legitimate operation that was using investor funds as marketed, when in reality it was a Ponzi scheme. Mrs. Shapiro knew that entities owned and controlled by Shapiro were the obligors on the underlying loans and that Shapiro's entities would not be paying interest as promised (as they lacked any funds to do so).

26. The scheme began to unravel in late 2017. On August 7, 2019, Shapiro entered into his *Plea Agreement* and Mrs. Shapiro entered into her *Consent to Forfeiture*.

***The Transfers***

27. Plaintiff is informed and believes and thereupon alleges that within the 90 days preceding the relevant transferor's petition date, Defendants received at least $2,400,000 (the "90 Day Transfers"), as reflected on Exhibit C hereto. Given the Shapiros' concealment of assets, there may be other 90 Day Transfers in addition to those reflected on Exhibit C.

28. Plaintiff is informed and believes and thereupon alleges that within the two years preceding the Initial Petition Date, Defendants received transfers of at least $18,401,351 (the "Two Year Transfers"), as reflected on Exhibit C hereto. The Two Year Transfers are inclusive of the 90 Day Transfers, but Plaintiff does not seek to recover the same sum more than once. Given the Shapiros' concealment of assets, there may be other Two Year Transfers in addition to those reflected on Exhibit C.

29. Plaintiff is informed and believes and thereupon alleges that within the four years preceding the Initial Petition Date, Defendants received transfers of at least $20,689,247.36 (the "Four Year Transfers" and, collectively with the 90 Day Transfers and the Two Year Transfers, the "Transfers"), as reflected on Exhibit C hereto. The Four Year Transfers are inclusive of the 90 Day Transfers and the Two Year Transfers, but Plaintiff does not seek to recover the same sum more than once. Given the Shapiros' concealment of assets, there may be other Transfers in addition to those reflected on Exhibit C.

**FIRST CLAIM FOR RELIEF**

**Avoidance and Recovery of Preferential Transfers**

30. Plaintiff realleges and incorporates herein Paragraphs 1 through 29, as if fully set forth herein.

31. The 90 Day Transfers constituted transfers of the Debtors' property.

32. The 90 Day Transfers were made to or for the benefit of Defendants on account of an antecedent debt and while the Debtors were insolvent. The affirmative assertion that the Debtors were insolvent at the times of the 90 Day Transfers is not intended and does not shift the burden of proof or alter the presumption of insolvency provided by Bankruptcy Code section 547(f).

33. By virtue of the 90 Day Transfers, Defendants received more than they would have received if the 90 Day Transfers had not been made and if Defendants received a distribution pursuant to a chapter 7 liquidation.

34. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 547(b), 550(a), and 551: (a) avoiding the 90 Day Transfers free and clear of any interest of Defendants, (b) directing that the 90 Day Transfers be set aside, and

(c) recovering the 90 Day Transfers or the value thereof from Defendants for the benefit of the Liquidation Trust.

**SECOND CLAIM FOR RELIEF**

**Avoidance and Recovery of Actual Intent Fraudulent Transfers – Bankruptcy Code**

35. Plaintiff realleges and incorporates herein Paragraphs 1 through 34, as if fully set forth herein.

36. The Two Year Transfers constituted transfers of the Debtors' property.

37. The Two Year Transfers were made by the Debtors with actual intent to hinder or delay or defraud their creditors insofar as the services allegedly provided in exchange for such transfers perpetuated a Ponzi scheme.

38. The Two Year Transfers were made to or for the benefit of Defendants.

39. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 548(a), 550(a), and 551: (a) avoiding the Two Year Transfers free and clear of any claimed interest of Defendants, (b) directing that the Two Year Transfers be set aside, and (c) recovering such Two Year Transfers or the value thereof from Defendants for the benefit of the Liquidation Trust.

**THIRD CLAIM FOR RELIEF**

**Avoidance and Recovery of Constructive Fraudulent Transfers – Bankruptcy Code**

40. Plaintiff realleges and incorporates herein Paragraphs 1 through 39, as if fully set forth herein.

41. The Two Year Transfers constituted transfers of the Debtors' property.

42. The Two Year Transfers were made by the Debtors for less than reasonably equivalent value at a time when the Debtors (i) were insolvent; and/or (ii) were engaged or about

to engage in business or a transaction for which any capital remaining with the Debtors were an unreasonably small capital; and/or (iii) intended to incur, or believed that Debtors would incur, debts beyond their ability to pay as such debts matured.

43. The Two Year Transfers were made to or for the benefit of Defendants.

44. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 548(a), 550(a), and 551: (a) avoiding the Two Year Transfers free and clear of any claimed interest of Defendants, (b) directing that the Two Year Transfers be set aside, and (c) recovering such Two Year Transfers or the value thereof from Defendants for the benefit of the Liquidation Trust.

## FOURTH CLAIM FOR RELIEF

### Avoidance and Recovery of Actual Intent Voidable Transactions – State Law

45. Plaintiff realleges and incorporates herein Paragraphs 1 through 44, as if fully set forth herein.

46. The Four Year Transfers constituted transfers of the Debtors' property.

47. The Four Year Transfers were made by the Debtors with actual intent to hinder or delay or defraud their creditors insofar as the services allegedly provided in exchange for such transfers perpetuated a Ponzi scheme.

48. The Four Year Transfers were made to or for the benefit of Defendants.

49. Each Debtor that made any of the Four Year Transfers had at least one creditor with an allowable unsecured claim for liabilities, which claim remained unsatisfied as of the Petition Date.

50. The Four Year Transfers are avoidable under applicable law – California Civil Code section 3439.04(a)(1) and/or comparable provisions of law in other jurisdictions that have

adopted the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act – by a creditor holding an allowed unsecured claim and thus by Plaintiff pursuant to Bankruptcy Code section 544(b).

51. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 544(b), 550(a), and 551: (a) avoiding the Four Year Transfers free and clear of any claimed interest of Defendants, (b) directing that the Four Year Transfers be set aside, and (c) recovering such Four Year Transfers or the value thereof from Defendants for the benefit of the Liquidation Trust.

## FIFTH CLAIM FOR RELIEF

### Avoidance and Recovery of Constructive Voidable Transactions – State Law

52. Plaintiff realleges and incorporates herein Paragraphs 1 through 51, as if fully set forth herein.

53. The Four Year Transfers constituted transfers of the Debtors' property.

54. The Four Year Transfers were made by the Debtors for less than reasonably equivalent value at a time when the Debtors (i) were insolvent; and/or (ii) were engaged or was about to engage in business or a transaction for which any capital remaining with the Debtors were an unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts beyond their ability to pay as such debts matured.

55. The Four Year Transfers were made to or for the benefit of Defendants.

56. At the time of and/or subsequent to each of the Four Year Transfers, each Debtor that made any of the Four Year Transfers had at least one creditor with an allowable unsecured claim for liabilities, which claim remained unsatisfied as of the Petition Date.

57. The Four Year Transfers are avoidable under applicable law – California Civil Code section 3439.04(a)(2) and/or comparable provisions of law in other jurisdictions that have adopted the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act – by a creditor holding an allowed unsecured claim and thus by Plaintiff pursuant to Bankruptcy Code section 544(b).

58. As a result of the foregoing, Plaintiff is entitled to judgment pursuant to Bankruptcy Code sections 544(b), 550(a), and 551: (a) avoiding the Four Year Transfers free and clear of any claimed interest of Defendants, (b) directing that the Four Year Transfers be set aside, and (c) recovering such Four Year Transfers or the value thereof from Defendants for the benefit of the Liquidation Trust.

## SIXTH CLAIM FOR RELIEF

### Fraud

59. Plaintiff realleges and incorporates herein Paragraphs 1 through 58, as if fully set forth herein.

60. Shapiro misrepresented the facts to Investors, including by making affirmative misrepresentations and by concealing and failing to disclose the true facts. Among the misrepresentations were that Investors were often told that they were investing money to be loaned with respect to particular properties owned by third parties, that those properties were worth substantially more than the loans against the properties, and that they would have the benefit of a stream of payments from these third parties for high-interest loans, protected by security interests and/or mortgages against such properties.

61. In reality, these statements were lies. Investors' money was almost never used to make high-interest loans to unrelated, third-party borrowers, and there was no stream of

payments; instead, Investors' money was commingled and used for an assortment of expenses, including maintaining a lavish lifestyle for Shapiro, Mrs. Shapiro and their family, brokers' commissions, overhead (largely for selling even more Notes and Units to Investors), and payment of principal and interest to existing investors. The money that was used to acquire properties (almost always owned by a disguised affiliate) cannot be traced to any specific Investor.

62. Shapiro made these misrepresentations knowingly, with scienter, and with intent to defraud Investors.

63. The Investors who contributed their claims to the Liquidation Trust justifiably relied on Shapiro's misrepresentations of facts, and as a direct and proximate result sustained hundreds of millions of dollars in damages.

64. As a result of the foregoing, Plaintiff is entitled to judgment holding Shapiro liable for fraud in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud

65. Plaintiff realleges and incorporates herein Paragraphs 1 through 64, as if fully set forth herein.

66. Mrs. Shapiro knowingly and substantially assisted Shapiro in defrauding Investors by among other activities, deception, material misrepresentations, and investor manipulation that allowed Shapiro to maintain his fraudulent enterprise.

67. Mrs. Shapiro knew of Shapiro's fraud and acted knowingly in providing substantial and material assistance to Shapiro.

68. Mrs. Shapiro substantially benefited by receiving income, commissions, bonuses and, utilizing the Debtor's assets to purchase works of art and jewelry and an extensive collection of luxury jewelry, wine and other assets.

69. As a result of the foregoing, Plaintiff is entitled to judgment holding Mrs. Shapiro liable for aiding and abetting fraud, in an amount to be proven at trial

## EIGHTH CLAIM FOR RELIEF

### Unjust Enrichment

70. Plaintiff realleges and incorporates herein Paragraphs 1 through 69, as if fully set forth herein.

71. The Debtors conferred benefits on the Defendants by transferring over $20 million from the Debtors' accounts to the Defendants or for the Defendants' benefit.

72. The Defendants knowingly accepted the benefits conferred on them by the Debtors.

73. The Defendants receipt of the benefits conferred upon them in connection with the Transfers was without justification or compensation to the Debtors and has unjustly enriched the Defendants.

74. Plaintiff has no adequate remedy at law to recover the value conveyed by the Debtors to the Defendants.

75. Accordingly, as a result of the Defendants' unjust enrichment at the Debtors' expense, Plaintiff is entitled to restitution from the Defendants in an amount to be determined.

## NINTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty**

76. Plaintiff realleges and incorporates herein Paragraphs 1 through 75, as if fully set forth herein.

77. At all relevant times, the RS Protection Trust (the "RS Protection Trust"), directly or indirectly, owned the majority of the interests of the Debtors.

78. At all relevant times, Shapiro, or members of his family, including Mrs. Shapiro, were the trustee(s) of the RS Protection Trust.

79. At all relevant times, members of Shapiro's family were the sole beneficiaries of the RS Protection Trust.

80. Because Shapiro and members of his family controlled the Debtors through the RS Protection Trust, Shapiro and Mrs. Shapiro owed to the Debtors fiduciary obligations of good faith, care and loyalty.

81. At the time of the Transfers and the operation of the Ponzi scheme, the Debtors (a) were engaged or were about to be engaged in a business for which their remaining assets and/or capital were unreasonably small in relation to their business, (b) intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due and/or (c) were insolvent or would be rendered insolvent by the Transfers or the Ponzi scheme. Consequently, Shapiro and Mrs. Shapiro each had a fiduciary obligation to the Debtors and their unsecured creditors to protect the interests of such creditors.

82. Shapiro and Mrs. Shapiro had a substantial financial interest in the Transfers and the Ponzi scheme because they formed the method by which Shapiro and Mrs. Shapiro enriched themselves for their own personal benefit.

83. Shapiro and Mrs. Shapiro breached their fiduciary duties by orchestrating, approving, and facilitating the Transfers and the Ponzi scheme as described above.

84. Because Shapiro and Mrs. Shapiro directly and indirectly owned and controlled the Debtors and the Corporate Defendants, they had conflicts of interest when balancing the interests of the Debtors and their creditors against the interests of the Corporate Defendants.

85. The corporate structure conceived and/or created by Shapiro and members of his family enabled Shapiro and Mrs. Shapiro to engage in the Transfers and the Ponzi Scheme.

86. Shapiro and Mrs. Shapiro engaged in self-dealing, acted in bad faith, breached their fiduciary duties (including the duty of loyalty), and took undue advantage of the Debtors by orchestrating, approving, and facilitating the Transfers and the Ponzi scheme.

87. The Debtors, their estates and their creditors have been damaged in an amount to be determined at trial as a result of the Transfers and Ponzi scheme orchestrated, approved and facilitated by Shapiro and the members of his family, including Mrs. Shapiro

## TENTH CLAIM FOR RELIEF

### Sale of Unregistered Securities (Securities Act Sections 5(a), 5(c), and 12(a))

88. Plaintiff realleges and incorporates herein Paragraphs 1 through 87, as if fully set forth herein.

89. The Notes and Units sold by Shapiro were securities within the meaning of the Securities Act.

90. No registration statement was filed or in effect with the SEC pursuant to the Securities Act with respect to the securities issued by the Debtors as described in this Complaint and no exemption from registration existed with respect to these securities.

91. From in or about July 2012 through at least December 4, 2017, Shapiro directly and indirectly:

a. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise

b. carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and/or

c. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the SEC as to such securities.

92. By reason of the foregoing, Shapiro violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

93. The Investors who contributed their claims to the Liquidation Trust purchased the unregistered securities issued by the Debtors and as a direct and proximate result sustained significant damages. Accordingly, the Liquidation Trust has standing under Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(1), to bring a cause of action seeking damages based on Shapiro's violations of Section 5(a) and 5(c) of the Securities Act.

94. As a result of the foregoing, Plaintiff is entitled to judgment holding Shapiro liable for the sale of unregistered securities, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter judgment:

**(1)** On the first claim for relief, (a) avoiding the 90 Day Transfers free and clear of any interest of Defendants, (b) directing that the 90 Day Transfers be set aside, and (c) ordering Defendants, jointly and severally, to pay to Plaintiff $2,400,000;

**(2)** On the second and third claims for relief, (a) avoiding the Two Year Transfers free and clear of any claimed interest of Defendants, (b) directing that the Two Year Transfers be set aside, and (c) ordering Defendants, jointly and severally, to pay to Plaintiff $18,401,351;

**(3)** On the fourth and fifth claims for relief, (a) avoiding the Four Year Transfers free and clear of any claimed interest of Defendants, (b) directing that the Four Year Transfers be set aside, (c) ordering Defendants, jointly and severally, to pay to Plaintiff $20,689,247.36;

**(4)** On the sixth claim for relief, holding Defendants jointly and severally liable for fraud, in an amount to be proven at trial;

**(5)** On the seventh claim for relief, holding Defendants jointly and severally liable for aiding and abetting fraud, in an amount to be proven at trial;

**(6)** On the eighth claim for relief, holdings Defendants jointly and severally liable for unjust enrichment, in an amount to be proven at trial;

**(7)** On the ninth claim for relief, holding Shapiro and Mrs. Shapiro jointly and severally liable for breach of fiduciary duty, in an amount to be proven at trial;

**(8)** On the tenth claim for relief, holding Shapiro and Mrs. Shapiro jointly and severally liable for damages, in an amount to be proven at trial, arising from Defendants' sale of unregistered securities; and

**(9)** On all claims for relief, awarding Plaintiff prejudgment interest as permitted by law, costs of suit, and such other and further relief as is just and proper.

Dated: January 27, 2020
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Richard M. Pachulski (CA Bar No. 90073)
Andrew W. Caine (CA Bar No. 110345)
Bradford J. Sandler (DE Bar No. 4142)
John A. Morris (*pro hac vice)*
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-4100
Fax: 302-652-4400
Email: rpachulski@pszjlaw.com
acaine@pszjlaw.com
bsandler@pszjlaw.com
crobinson@pszjlaw.com

-and-

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Kenneth N. Klee (*pro hac vice*)
Michael L. Tuchin (*pro hac vice*)
David A. Fidler (*pro hac vice*)
Jonathan M. Weiss (*pro hac vice*)
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067

*Counsel to the Liquidation Trust*